2011 UT 42

**Douglas Patrick DOYLE, Petitioner and Appellant,**

v.

**Robin Elaine DOYLE, Respondent and Appellee.**

**No. 20090989.**

Supreme Court of Utah.

July 22, 2011.

Steve S. Christensen, Matt Anderson, Benjamin K. Lusty, Salt Lake City, for petitioner.

Suzanne Marelius, Salt Lake City, for respondent.

Justice LEE, opinion of the Court:

¶ 1 Robin Doyle petitioned the trial court for a modification of the custody of her son, Hyrum. After a two-day bench trial, the court granted her petition, transferring custody from the child's father, Doug Doyle, to Robin. Doug appealed to the court of appeals, which affirmed in part and reversed and remanded in part. Doug then sought certiorari here on the issues affirmed by the court of appeals.

¶2 On certiorari, Doug contends that the trial court made three critical errors that were affirmed by the court of appeals. First, he asserts that the trial court inappropriately allowed presentation of evidence regarding both changed circumstances and best interests before affirmatively ruling that circumstances had changed. Second, Doug argues that the evidence presented at trial was insufficient to support a finding of changed circumstances. Third, Doug suggests that the trial court inappropriately granted Robin relief on an issue (child support modification) that she did not ask for.

¶3 We disagree and affirm the decision of the court of appeals. This court long has required that district courts determine that circumstances have materially and substantially changed *before* determining whether it would be in the best interests of the child to modify custody. Yet we have never required courts to conduct separate hearings regarding the two types of evidence. And we decline to do so now. We agree with the court of appeals that the trial court in this case appropriately received evidence regarding changed circumstances and best interests. We also agree that the court then correctly found a change in circumstances. Only then did it determine that it was in Hyrum's best interests to transfer custody from Doug to Robin.

¶4 Finally, we agree with the court of appeals that the trial court had ample authority to raise the issue of child support. Moreover, because the trial court raised that issue and provided Doug with the opportunity to oppose modification, we reject his argument that he was somehow prejudiced or surprised by the court's ruling on that issue.

I

¶5 Doug and Robin Doyle are the parents of Hyrum Doyle. Hyrum has various physical and learning disabilities, some of which stem from a degenerative nerve disorder. In 2004, when Hyrum was eight years old, the Doyles sought a divorce before the Third District Court (Judge Frank Noel). The court entered a divorce decree on February 28, 2005, awarding sole legal and physical custody of Hyrum to Doug.

¶6 At the time of the divorce decree, Robin lived in Colorado, while Hyrum lived with Doug in Salt Lake City. The divorce court noted that Doug at times treated both Robin and Hyrum abusively. The court specifically referred to one incident "in which Doug slapped Hyrum and in which Doug verbally abused Hyrum." Despite this incident, the court concluded that Doug had subsequently demonstrated a change in his parenting and had shown a "sincere desire to improve and be a good father." While "naturally concerned," the court "fe[lt] that the likelihood of abuse directed to" Hyrum was "unlikely in the future in light of Doug's sincere efforts and success in improving his parenting abilities."

¶7 The court also noted that Doug and Hyrum shared a loving relationship, that Hyrum had "thrived" in his father's care, and that he was "happy and contented in Doug's custody." The court further concluded that the evidence "suggests that [Hyrum] has established a network of friends and relationships in which he is happy, and that he is actively involved in scouting and church activities." Based on these findings, the court awarded sole legal and physical custody of Hyrum to Doug, while also indicating that Robin and Doug were equally capable of meeting Hyrum's needs.

¶8 The court's decree also contemplated that Doug and Robin would cooperate with each other in sharing time with Hyrum. The court ordered, for example, "that Robin be given reasonable telephone visitation with Hyrum, not to be interfered with by Doug." The court also found "that it will be a very serious violation of the divorce decree if either party unreasonably interferes with the other party's access to the child, or the other party's attempts to develop a loving relationship with the child."

¶9 The finding of equal parenting ability was significant enough to the divorce court that it inserted an unusual condition into the divorce decree: "in the event" Robin "relocates to the Salt Lake Valley, the parties will have joint legal and physical custody and shall share time equally." Relying on this unusual condition, Robin moved from Denver

to Salt Lake City in May 2005. Doug filed a motion to set aside the judgment under rule 60(b) of the Utah Rules of Civil Procedure, arguing that the automatic change of custody provision in the original divorce decree impermissibly allowed custody to be prospectively changed based upon a future triggering event. The district court (Judge Deno Himonas) granted Doug's motion, concluding that the divorce decree's provision allowing for an automatic change of custody was unlawful because a "change of custody requires notice and a hearing and cannot occur automatically upon a specified event." *See* UTAH CODE ANN. § 30–3–10.4(1) (Supp.2010)[1] (requiring a hearing before a court may modify a custody order). The district court amended the divorce decree and excised the automatic change in custody provision, leaving Doug with custody of Hyrum. Robin did not appeal the district court's order.

¶ 10 On October 11, 2005, Robin petitioned to modify the custody award under Utah Code section 30–3–10.4, maintaining that there had been a substantial and material change in circumstances because (1) she now resided in the Salt Lake Valley, in the same neighborhood as Doug and Hyrum; (2) she had relocated in reliance on the now-invalidated joint custody provision; and (3) Hyrum's best interests require stability in his custodial arrangement, including a stable relationship with Robin. Robin's petition did not request a modification of the original child support order. Trial on the petition to modify custody was eventually set for October 2 and 3, 2007.

¶ 11 Before trial, Doug moved to bifurcate the trial into separate hearings—the first to address whether a substantial and material change in circumstances had occurred and, if so, the second to consider whether a custody modification would serve Hyrum's best interests. The trial court (Judge Denise Lindberg) denied Doug's motion for separate hearings but agreed that the law required the court to first determine whether there had been a substantial and material change in circumstances before reaching the best interests question. Because it would be "un-reasonable to expect" witnesses "who [are] very busy . . . to come in and testify twice at different points in the proceedings," Judge Lindberg deemed evidence concerning changed circumstances and best interests to be admissible in a single hearing.

¶ 12 Doug objected specifically to a custody evaluation report by Dr. Valerie Hale, the court-appointed custody evaluator. In a pretrial motion, Doug asserted that Dr. Hale's report should be excluded because some of the information in the report went to the issue of best interests, which in his view could not be considered at the initial phase of the trial. The court denied the motion based on its prior ruling on the bifurcation issue.

¶ 13 Robin presented evidence on the first day of trial. The court received testimony from several witnesses, including Robin; Dr. Hale, including testimony regarding her disputed report; and various officials from Hyrum's school.

¶ 14 Robin testified that since the divorce, Hyrum's anxiety had increased, prompting her to begin taking him to counseling, which Doug opposed; that Doug insisted on making one-hour minimum phone calls to Hyrum each day, despite his age and physical discomfort at such long calls; that Doug had had five or six different jobs since the divorce; that Doug had struck Hyrum so firmly that it left a handprint, that he spanked him, threatened to punch him, and on one occasion shook him so hard that Hyrum called Dr. Hale to inform her of the incident; that Doug took Hyrum out of special education classes and speech therapy classes; and that Doug had excluded Robin from meetings with Hyrum's school teachers and alienated the school and administrators with onerous demands.

¶ 15 Dr. Hale testified that in Hyrum's initial interview he was "immature and distressed"; that he wanted substantially more time with Robin; that he wanted to live with Robin in Colorado, but that feeling was "top secret"; that he was "punished a lot" and said that "at my dad's, I feel like I am behind bars, I can't say a lot of things, he yells at

---

1. Because there have been no substantive changes to the relevant statutes that would affect this opinion, we cite to the current versions, unless otherwise indicated.

me"; that Doug defended his use of spanking despite recommendations by the divorce court and Dr. Hale not to spank; that her meetings with school personnel confirmed that Doug interfered in the teaching of his son, barred the school from giving information to Robin, and was so aggressive and threatening to personnel as to require police to be on standby; that Hyrum felt pressured and had difficulty doing homework with Doug, but that Robin was able to get him to do his homework with less stress; that Robin helped Hyrum buy gifts for Doug, but that Doug would not help him buy gifts for Robin; that Doug unplugged the phone while Hyrum and Robin were speaking; that Hyrum often does not want to go back to Doug's home, but that he never does not want to go back to Robin's home; that he fights frequently with Doug, gets frustrated, and has to punch a pillow to vent his frustrations.

¶ 16 School personnel testified that Doug discontinued Hyrum's participation in special education and resource classes, which negatively impacted his scholastic progress. They also indicated that when they confronted Doug with evidence of Hyrum's continued need for special education services, Doug stated that he could personally provide any extra support to Hyrum without school help. According to school officials, Hyrum was socially isolated and Doug disrupted his education by inappropriately confronting teachers and threatening litigation.

¶ 17 One teacher testified that Doug had sent so many critical and threatening e-mails that she felt it necessary to copy all e-mails and communications with Doug to the principal. Another teacher testified of conflicts with Doug, including lengthy conversations during class time that disrupted her teaching. This teacher had very positive views of Robin, in contrast, who was a regular volunteer in her class. She confirmed that Hyrum was working below grade level in all four core subject areas. Another teacher testified that Doug insisted that no school records be given to Robin and that she not be present in any meetings about Hyrum.

¶ 18 At the beginning of the second day of trial, the court made a "preliminary" finding that substantial and material changes had occurred since entry of the divorce decree. The court declined to make a final determination on the issue, however, until the remainder of the evidence had been presented and Doug had been afforded a full opportunity to rebut Robin's evidence. The court based its preliminary finding on several factors. First, the court noted the "unusual posture" of the case—that Robin "materially altered her position and relied upon" the now defunct provision of the divorce decree that provided for automatic transfer of custody. The court also found additional support for its conclusion in the fact that Hyrum was not thriving, in part because Doug had taken him out of special education classes and would not allow him to attend therapy; that the divorce decree "relied heavily on the expectation that [Doug] would learn and adopt new disciplining methods," but that the evidence was that he continued to rely on "corporal punishment"; and that Doug had "exclude[d] and marginalize[d] [Robin] from Hyrum's life and from any contact and involvement on her part with school, medical professionals, etc.," all in direct contravention of the cooperation that "was contemplated by the Court at the time the decree was entered."

¶ 19 At the conclusion of the second day of trial (after hearing Doug's rebuttal evidence), the court reaffirmed its preliminary finding. The trial court then determined that it would be in Hyrum's best interest to grant Robin sole legal and physical custody. The court found convincing in this regard the testimony and recommendations of Dr. Hale to the effect that Robin was more likely to foster an ongoing relationship between Hyrum and Doug, which had not taken place while Doug was the custodial parent.

¶ 20 In reaching this conclusion, the court also relied on the testimony of school witnesses to the effect that Robin appeared to have a better understanding of Hyrum's academic needs than Doug. The trial court found that Doug had taken actions to isolate Hyrum and to undermine his needs, such as taking him out of special education programs. It also specifically found that Robin's interactions with the school were very positive, and that she had volunteered over a period of years, had a good relationship with the teach-

ers, and was very responsive to Hyrum's needs, even though she had been limited by Doug's efforts to exclude her from participating in Hyrum's educational decisions.

¶ 21 After the trial, Robin submitted a proposed order that included a proposed modification of child support. Robin had not previously asked for a modification of child support. Doug objected to the proposed modification. After requesting and receiving supplemental briefing on the support issue, the court modified the support order and ordered Doug to pay child support. Although the court acknowledged that Robin had not initially requested a support modification, it found that it had the authority to modify support under rule 54(c)(1) of the Utah Rules of Civil Procedure, which provides that "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings." Accordingly, the court modified the support order according to calculations Robin submitted, based on the table contained in subsection (2) of Utah Code section 78B–12–301.[2]

¶ 22 Doug pressed an appeal to the court of appeals. That court affirmed in part and reversed and remanded in part. *See Doyle v. Doyle*, 2009 UT App 306, 221 P.3d 888. The court affirmed the trial court's refusal to formally bifurcate the presentation of changed circumstances and best interests evidence. It also found a substantial change in circumstances, most notably in Robin's return to Salt Lake City. The court of appeals then sanctioned the trial court's authority to modify child support despite the fact that Robin had not requested it, but reversed and remanded for recalculation of child support under alternate guidelines.

## II

¶ 23 On certiorari to this court, Doug challenges the court of appeals' affirmance of the trial court's order on three grounds: (1) for-

mal bifurcation of the changed circumstances and best interests proceedings is required by Utah law; (2) there was no change in circumstances in this case because only changes in the custodial parent's circumstances warrant a reopening of a litigated custody decree; and (3) there was no basis for modification of the child support order in the absence of a specific request in Robin's petition for modification of custody. We disagree and accordingly affirm.

### A

¶ 24 Under Utah law, a trial court "may, after a hearing, modify ... an order that established joint legal or physical custody if" (a) "the circumstances of the child or one or both parents ... have materially and substantially changed since the entry of the order to be modified," and (b) "a modification of the terms and conditions of the order would be an improvement for and in the best interest of the child." UTAH CODE ANN. § 30–3–10.4(1) (Supp.2010). In *Hogge v. Hogge*, 649 P.2d 51 (Utah 1982), we established a two-step approach for the resolution of motions to modify custody. Under *Hogge*, a court first must decide "whether there are changed circumstances warranting the exercise of the court's continuing jurisdiction to reconsider the custody award." *Id.* at 53. Only if circumstances have materially and substantially changed may the court proceed to the second step—a determination "as to the manner in which custody should be modified, if at all," based on a *de novo* review of the child's best interests. *Id.; see also Becker v. Becker*, 694 P.2d 608, 611 (Utah 1984) ("[I]n order to reach the best interests standard and reconsider a custody award, there must be a showing that there has been a change in circumstances that is material to the custody issue.").

¶ 25 This two-part scheme for modifying custody—which the *Hogge* court variously described as a "bifurcated approach,"

---

**2.** On appeal, the court of appeals determined that the trial court employed the wrong subsection of section 78B–12–301 and accordingly reversed and remanded for a determination of the proper amount Doug must pay under the statute. Insofar as the modification of the child support

order was legally appropriate (a point which Doug does not concede in this petition for certiorari), Doug has not appealed the determination of the court of appeals concerning the amount, and we do not address that issue in this opinion.

*Hogge,* 649 P.2d at 53, a "bifurcated procedure," *id.,* and a "bifurcated process," *id.* at 55—is deliberate. Prohibiting a court from "reopen[ing] the custody question until it ha[s] first made a threshold finding of substantially changed circumstances," *id.* at 53, serves multiple interests. First, because "a custody decree is predicated on a particular set of facts, that decree is *res judicata.*" *Id.* The threshold requirement of changed circumstances thus "prevents an unnecessary drain on judicial resources by repetitive litigation of the same issue when the result would not be altered." *Kramer v. Kramer,* 738 P.2d 624, 628 (Utah 1987) (Stewart, Associate C.J., concurring in the result). Second, the threshold requirement similarly "protect[s] the custodial parent from harassment by repeated litigation." *Hogge,* 649 P.2d at 53–54. Finally, the threshold standard "protect[s] the child from 'ping-pong' custody awards." *Id.* at 54. The threshold requirement of a change in circumstances

> is intended to ensure sufficient stability in children's lives to enable them to develop relationships and a sense of familiarity with their surroundings that enhance their sense of security and self-identity, enabling them to find appropriate role models after which to pattern their lives and to develop the ability to give and receive love, a necessary requirement for achieving full potential as human beings.

*Kramer,* 738 P.2d at 628 (Stewart, Associate C.J., concurring in the result).

¶ 26 On the morning of the second day of trial in this case, the trial court made a "preliminary" finding of changed circumstances. This decision was based on testimony by Robin, Dr. Hale, and representatives from Hyrum's school. At the end of the trial, the court reaffirmed its preliminary finding. Only then did the court consider Hyrum's best interests, concluding that it was in his best interest to be in Robin's custody. It is therefore clear that the trial court *analytically* bifurcated the changed circumstances from the best interests evidence.

3. *See* BLACK'S LAW DICTIONARY 1644 (9th ed. 2009)

¶ 27 Doug nevertheless argues on appeal that the trial court didn't go far enough—that our case law interpreting the custody modification statute establishes a legal regime that requires complete, formal separation of the changed circumstances and best interests determinations. According to this view, a party seeking a modification of custody may not present *any* evidence relevant to the child's best interests until there has first been a judicial determination that a legally sufficient change in circumstances has taken place. In other words, Doug argues, changed circumstances and best interests evidence must be presented in completely separate proceedings, and any conflation of the two types of evidence before a judicial determination of changed circumstances is error. Doug insists that this view follows from *Hogge* and subsequent cases and finds support in a policy concern that best interests evidence will always "taint" a district court's finding of changed circumstances.

¶ 28 We acknowledge that elements of the *Hogge* analysis seem to support Doug's view, but ultimately reject his argument and hold that only analytical—and not formal procedural—bifurcation is required. On one hand, the *Hogge* court spoke of a "bifurcated procedure" where at the first step "the court will receive evidence only as to the nature and materiality of any changes in those circumstances upon which the earlier award of custody was based" and where "the trial court will not reach the second step" if the burden of establishing changed circumstances is not met. *Hogge,* 649 P.2d at 54. The *Hogge* court further stated that "[i]n the initial step, the [trial] court will receive evidence *only* as to the nature and materiality of any changes in those circumstances upon which the earlier award of custody was based." *Id.* (emphasis added); *see also Becker,* 694 P.2d at 610 ("The required showing of materiality is to be distinguished from the evidence that is appropriately presented in the second phase of the proceeding in which the 'best interests' analysis occurs."). In fact, the term "bifurcation" normally refers to formal separation of two parts of a case (e.g., liability and damages), not just analytical separation of two different inquiries.[3]

(defining a "bifurcated trial" as a "trial that is

¶ 29 That said, other portions of the *Hogge* opinion cut the other way. *Hogge* indicates, for example, that a trial court may proceed to the "second step" "as a continuation of the same hearing." *Hogge*, 649 P.2d at 54. And *Hogge* placed emphasis on separate findings or "steps," not necessarily on separate hearings.

¶ 30 Moreover, the *Hogge* court held that the trial court in that case had properly followed the two-step procedure. Yet our review of the record from *Hogge* demonstrates that the trial court in that case did not *formally* bifurcate in the manner advocated by Doug. Rather, the court heard all of the evidence (changed circumstances plus best interests) in one day—February 27, 1981—and determined in a later memorandum decision (1) "[t]hat a substantial change of circumstances ha[d] occurred since plaintiff was awarded custody of the minor children" and (2) "[t]hat the best interests of the aforesaid minor children would be served by their custody being changed from plaintiff to defendant subject to reasonable rights of visitation by plaintiff." Our decision in *Hogge* was that the trial court's finding regarding changed circumstances was "amply supported by the evidence, [and was] sufficient to justify relitigation of the question of custody." *Id.* at 55. Accordingly, we held that "the [trial] court properly proceeded to the second step in the bifurcated process—a *de*

*novo* consideration of all evidence bearing on the question of the best interests of the children." *Id.* Our decision in *Hogge*, then, was an endorsement of the district court's *analytical* bifurcation, despite the fact that the district court in that case had not *formally* bifurcated in the sense of holding separate hearings on the two issues.

¶ 31 *Hogge* also referred to several cases in other jurisdictions that had "adopted a bifurcated procedure for considering petitions to modify custody awards." *See id.* at 54 (citing *Black v. Black*, 114 Ariz. 282, 560 P.2d 800 (1977); *Smith v. Smith*, 212 So.2d 117 (Fla. Dist.Ct.App.1968); *In re Marriage of Greisamer*, 276 Or. 397, 555 P.2d 28 (1976); *In re Marriage of Remillard*, 30 Or.App. 1111, 569 P.2d 651 (1977); *Goldstein v. Goldstein*, 115 R.I. 152, 341 A.2d 51 (1975); *Raven v. Cecil*, 262 S.C. 509, 205 S.E.2d 837 (1974); *Masek v. Masek*, 90 S.D. 1, 237 N.W.2d 432 (1976); *Gokey v. Gokey*, 127 Vt. 334, 248 A.2d 738 (1968)). As far as we can tell, however, none of those cases required formal procedural bifurcation. Some expressly required analytical bifurcation,[4] while others did not even clearly bifurcate the issues analytically, but simply mentioned changed circumstances and best interests as factors of apparently equal dignity in a modification determination.[5]

¶ 32 It thus appears that we have never explicitly required complete, formal bifurca-

divided into two stages, such as for guilt and punishment or for liability and damages").

**4.** *See Black*, 560 P.2d at 801 ("First, the court must ascertain whether there has been a change in circumstances materially affecting the welfare of the child. Only after this initial finding has been made may the trial court then proceed to determine whether a change in custody will be in the best interests of the child." (citation omitted)); *In re Marriage of Remillard*, 569 P.2d at 653 ("[There are] two essential requirements in deciding if a change of custody is warranted. The parent seeking a change in custody must show that subsequent to the last custody modification the capacity of either parent to properly care for the child has changed. And, considering all the circumstances, it would be in the best interest of the child to make the change."); *Masek*, 237 N.W.2d at 434 ("It has long been the rule in South Dakota that before a court can modify a decree of divorce under [state law] there must be a change of circumstances.... There is a second factor to be considered by trial courts in deciding change of custody requests.

That is the welfare and best interests of the children.").

**5.** *See Goldstein*, 341 A.2d at 52 ("There can be no question that [the] record discloses a sufficient change in the circumstances affecting the child's custody to permit a reopening of the August 1970 decree awarding custody of the child to the father. That being so, the polestar for the trial justice's guidance was what in the circumstances of this particular case was best for the welfare of this 9½ year-old girl."); *Raven*, 205 S.E.2d at 838 (stating the "general rule that a child custody decree is not final, but is subject to modification or change upon the showing of a material change in conditions affecting the welfare of the child," but saying nothing of bifurcation, analytical or otherwise); *Gokey*, 248 A.2d at 739 ("It is the settled law of this court that to warrant the modification of a custody order the petitioner must show a substantial change in the material circumstances since the date of the decree. It is equally well settled that it is the welfare of the child which in the last analysis is determinative in a custody matter." (citations omitted)).

tion of the sort advocated by Doug. We decline to impose such a requirement now, for several reasons.

¶ 33 For starters, separating evidence regarding changes in circumstances from best interests evidence at the outset of trial would be impractical and inefficient, especially since "the evidence supporting changed circumstances" is often "the same evidence that is used to establish the best interests of the child." *Moody v. Moody*, 715 P.2d 507, 511 (Utah 1985) (Daniels, District J., concurring). As the court of appeals correctly pointed out in this case, the evidence presented on the first day of trial was "duplicative and overlapping [in] nature" in that it provided evidence both of the changed circumstances and Hyrum's best interests. *Doyle v. Doyle*, 2009 UT App 306, ¶ 14, 221 P.3d 888. Hyrum's "decreased sociability and his increasing behavioral and educational needs, [Doug's] failure to make various parental adjustments contemplated in the Divorce Decree, and [Doug's] inability and unwillingness to co-parent with" Robin, *id.*, all go both to the changed circumstances and best interests elements.

¶ 34 Moreover, a requirement of formal bifurcation would cause substantial inefficiencies. Witnesses frequently would be "recalled to give further testimony in the second phase of the hearing," causing "inconvenience for the witness[es] and expense for the parties." *Moody*, 715 P.2d at 511 (Daniels, District J., concurring). In this case, for example, separate hearings on changed circumstances and best interests would have required Hyrum's school teachers to each appear twice, requiring them to be away from their classrooms an extra day. And in all likelihood, they would have had to give the same testimony over again at the second hearing (because the bulk of their testimony went to both changed circumstances and best interests), causing significant inconvenience to them and multiplying the burden on our already burdened courts.

■ ¶ 35 We also reject Doug's argument that failure to formally bifurcate prejudiced him because any subsequent finding of changed circumstances would have been "tainted" with best interests evidence. We

reject this argument given the often duplicative nature of testimony in a custody modification case. School personnel testimony, for example, demonstrated both changed circumstances and Hyrum's best interests—Hyrum's current lack of educational thriving and the likelihood that his educational situation will continue to deteriorate. If Doug's "taint" argument were taken to its logical end, the trial court would have been required to exclude this testimony, even though it was highly probative of the changed circumstances determination.

■ ¶ 36 That is not to say that the changed circumstances and best interests evidence are always the same. Nor are they always difficult to distinguish in circumstances where they don't overlap. A "change of circumstances involves a very narrow spectrum of evidence. It should not be difficult for trial courts to keep the two separate." *Kramer*, 738 P.2d at 626 n.1. But for the reasons stated above, it would be impractical and inefficient to impose a requirement of formal bifurcation from the outset of trial. Instead, courts may mentally sort out changed circumstances and best interests evidence and keep them analytically separate.

¶ 37 In fact, declining to require formal bifurcation serves the general policy interest of allowing a trial court "wide discretion in controlling the mode and order of the presentation of evidence ... provided it ke[eps] its analysis appropriately bifurcated." *Huish v. Munro*, 2008 UT App 283, ¶ 18, 191 P.3d 1242. Appellate courts should not lightly dictate the order of presentation of evidence at trial. That responsibility ordinarily lies with the district court, which is in the best position to manage the trial in a way that will "avoid needless consumption of time"—the court's, the parties', and the witnesses'. UTAH R. EVID. 611(a).

■ ¶ 38 Although we reject today the notion of formal bifurcation of changed circumstances and best interests evidence in custody modifications, we reiterate that courts must keep them analytically separate. It is only where circumstances have substantially changed that the trial court may reopen

a litigated custody order and reevaluate the best interests of the child *de novo*. Even an overwhelming case for the best interest of the child could not compensate for a lack of proof of a change in circumstances. *See Becker*, 694 P.2d at 611 (rejecting bare best interests argument and stating that "in order to reach the best interests standard and reconsider a custody award, there must be a showing that there has been a change in circumstances that is material to the custody issue").

¶ 39 The trial court in this case determined at the end of trial that circumstances had materially and substantially changed. It then found it to be in Hyrum's best interests to modify the custody order. Because the court kept the two relevant elements analytically separate, we hold that the trial court appropriately followed the two-step *Hogge* test and affirm the court of appeals' endorsement of its approach.

## B

¶ 40 Doug also challenges the court of appeals' affirmance of the trial court's finding that circumstances had changed materially and substantially enough to satisfy the first prong of the *Hogge* test. A "trial court is given particularly broad discretion in the area of child custody incident to separation or divorce proceedings." *Wall v. Wall*, 700 P.2d 1124, 1125 (Utah 1985) (per curiam) (internal quotation marks omitted). Such discretion extends to a determination that circumstances have changed enough to justify reconsideration of a child's custody. Such a determination "frequently turns on numerous factors which the trial court is best suited to assess, given its proximity to the parties and the circumstances. Only where trial court action is so flagrantly unjust as to constitute an abuse of discretion should the appellate forum interpose its own judgment." *Id.* (internal quotation marks omitted).

¶ 41 We agree with the court of appeals' decision affirming the district court's finding of a material change of circumstances. As Doug indicates, our cases have adopted a general rule that "[t]he asserted change must … have some material rela-

tionship to and substantial effect on *parenting ability or the functioning of the presently existing custodial relationship*" and not on the parenting of the noncustodial parent. *Becker*, 694 P.2d at 610 (emphasis added). But there is an exception to the general rule. Where the original custody award "was subject to or apparently conditioned upon an improvement" in the noncustodial parent's circumstances, a court may properly consider those changes in deciding to reopen the original custody determination. *Kramer*, 738 P.2d at 626. We have also recognized that modification may be appropriate where "the party seeking modification" has demonstrated "that since the time of the previous decree, there have been changes in the circumstances upon which the previous award was based." *Hogge*, 649 P.2d at 54.

¶ 42 Under these standards, we agree with the court of appeals' decision affirming the trial court's finding of a change in circumstances. The initial custody order was entered, in part, on premises that both parents were capable but that Robin would be living in Colorado and that it was not in Hyrum's interest to suffer the disruption of a move from a place where he was succeeding. In fact, the original order provided that in the event Robin were to move back to Utah, Robin would automatically be granted joint physical custody. Although, as Doug points out, this clause was legally invalid (because custody cannot automatically change under the law), the decree clearly indicated that the award of custody to Doug was contingent on Robin's residing out of state. Robin's move back to Utah, then, was a material change of circumstances "upon which the [original custody] award was based," particularly where the trial court originally found both parents to be fit and made the custody award based on the view that a move would not be in Hyrum's best interests.

¶ 43 Robin's return to Utah is not the only changed circumstance found by the trial court. The court found several changes based on Doug's parental situation. First, the trial court found that Doug had tried to marginalize Robin's relationship with Hyrum (e.g., by unplugging the phone and restricting other contacts between Hyrum and Rob-

in), prevented her from attending Hyrum's school conferences, and asked the school not to provide her with direct access to Hyrum's school records. Doug argues that his uncooperative behavior did not rise to the level of denying parent time, but the initial decree contemplated parental cooperation. Doug's obstinacy evidences changes in the contemplated cooperative relationship.

¶ 44 Second, there was evidence that Doug had removed Hyrum from special education services against the recommendations of providers and was also disruptive with school staff and had alienated teachers and administrators—to the degree that they felt the need to have police on standby when he was present and to include the school principal on e-mails with Doug. School personnel testified that these actions impaired Hyrum's educational well-being. His educational deterioration was another manifestation of changed circumstances.

¶ 45 Finally, the evidence showed that Doug continued to engage in corporal punishment of Hyrum. The original divorce decree stated that Doug had engaged in such behavior in the past, but that he was sorry for his actions, had changed, and would continue to soften his parenting style in the future. The trial court found that Doug's continued harsh punishment methods violated an understanding "upon which the previous award was based," justifying a finding of changed circumstances. Doug argues that his failure to "make improvements" in his parenting should not constitute a material change in circumstances. That may be the normal rule, but in this case the divorce court based its custody order in part on an understanding that Doug had abandoned corporal discipline. His resumption of those practices evidences a change in circumstances "upon which the previous award was based."

¶ 46 We thus find no abuse of discretion in the trial court's finding of changed circumstances, and accordingly affirm the court of appeals on that issue.

### C

¶ 47 Doug also contends that the trial court's modification of child support was inappropriate because Robin failed to request and was not entitled to such relief. The court of appeals found that the trial court had the authority to modify the original child support order under rule 54(c)(1) of the Utah Rules of Civil Procedure, which provides that "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings." Doug argues that a modification of child support is not just additional "relief" of relevance to the petition to modify custody, but is a separate claim altogether that was not encompassed within the matters presented at trial. *See Combe v. Warren's Family Drive–Inns, Inc.,* 680 P.2d 733, 735 (Utah 1984) ("Although Rule 54(c)(1) permits relief on grounds not pleaded, that rule does not go so far as to authorize the granting of relief on issues neither raised nor tried.").

¶ 48 We agree with the court of appeals that the trial court had ample authority to raise the question of child support. As it played out, however, rule 54(c)(1) was not the only rule implicated by the court's ultimate ruling on the child support issue. Except in case of a default judgment, rule 54(c)(1) provides that the judgment need not be limited in kind or amount by a party's demand for relief, but may include the relief to which the successful party is entitled. The rule "requires the courts to be liberal in awarding appropriate relief" so long as (1) that relief is "justified by the facts developed" and (2) "the failure to request a particular form of relief does not prejudice a party in the preparation or trial of the case." *Butler v. Wilkinson,* 740 P.2d 1244, 1263 (Utah 1987). To show prejudice, a party must "represent[ ] to the court that he was taken by surprise or otherwise at a disadvantage in meeting that issue." *Cheney v. Rucker,* 14 Utah 2d 205, 381 P.2d 86, 91 (1963).

¶ 49 Doug cannot argue that he was *surprised* by a grant of relief on the child support issue. In fact, the trial court forewarned Doug that it was considering an unasked-for modification of child support, allowed Doug to submit supplemental briefing on the matter, and even held a hearing to discuss the merits of modification.

¶ 50 As to the first requirement, Doug vaguely argues that modification of child support was not justified by the facts developed at trial. But he provides no context for that assertion, and we see no reason in the record to agree with it. Robin petitioned for a modification of child custody. Inherent in that petition is the issue of child support, for as the code provides, child support "shall follow the child." UTAH CODE ANN. § 78B–12–108(1) (2008). At the end of the trial, the court ruled from the bench that circumstances had changed and that it was in Hyrum's best interest to grant Robin custody. Because the physical custody of Hyrum changed, it became apparent that the issue of child support would have to be considered.

¶ 51 Although Doug recognizes that the child support guidelines found in Utah Code section 78B–12–301 are to be applied as a rebuttable presumption without the need for factual findings, he contends that he was entitled to and denied the chance to put on evidence to rebut that presumption by showing that "an award amount resulting from use of the guidelines would be unjust, inappropriate, or not in the best interest of a child in a particular case." *Id.* § 78B–12–210(3). According to Doug, he was deprived of this opportunity because no testimony was given on this issue during trial or at the post-trial hearing on the support modification issue. Doug has not demonstrated, however, that he asserted his right to put on evidence in the district court to rebut the guidelines. Instead, in his supplemental brief regarding child support filed in the district court, Doug simply made legal arguments, addressing which guidelines should apply and regarding his perception that it would be inequitable to require him to pay support. But Doug never asserted a right to submit evidence to rebut the presumption that the guidelines' amounts were just and proper. He accordingly forfeited that argument, and we will not entertain it here. It was thus within the trial court's rule 54(c)(1) power to grant relief on this issue.

¶ 52 Ultimately, the real question (which Doug has not asked) is whether the trial court had the authority to raise the support modification issue *sua sponte* and to ask for supplemental briefing on that matter without a request from Robin to amend her pleadings. The answer to that question is yes. Rule 15 of the Utah Rules of Civil Procedure provides that "[w]hen issues not raised by the pleading are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." UTAH R. CIV. P. 15(b). The rule further states that

> [i]f evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits.

*Id.* And under the rule, the "court shall grant a continuance, if necessary, to enable the objecting party to meet such evidence." *Id.*

¶ 53 The trial in this case concerned a modification of the original child custody order, which in turn implicitly contemplated a modification in the child support order. Having decided to grant Robin's petition for modification of the custody order, the court appropriately considered the issue of child support. In so doing, it "treated" "issues not raised by the pleading" but which were "tried by . . . implied consent of the parties" "as if they had been raised in the pleadings." *Id.* Child support is ordinarily administered without the need of factual findings unless a party objects and asks to put on evidence to rebut the child support guidelines. In the district court, Doug claimed no prejudice from the court's determination of issues not raised explicitly by the pleadings and sought no continuance under rule 15(b) to facilitate any further response he might make to a request for a change in child support. Thus, absent a request by Doug to put on evidence to rebut the guidelines, the court appropriately determined as a matter of law that a modification of the child support order was proper. We accordingly affirm the court of appeals' decision upholding the trial court's authority to consider this issue.

## III

¶ 54 The trial court adopted appropriate procedures in its ordering of evidence of changed circumstances and best interests in this case. It also acted well within its discretion in finding a substantial and material change of circumstances and in awarding custody of Hyrum to Robin Doyle. With respect to the challenge to the modification of the child support order entered in the district court, Doug Doyle failed to demonstrate that the trial court lacked authority to raise the issue *sua sponte*. We accordingly agree with the decision of the court of appeals and affirm.

¶ 55 Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice PARRISH, and Justice NEHRING concur in Justice LEE's opinion.